E-FILED
Tuesday, 31 July, 2018 10:39:24 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITES STATES OF AMERICA,<br><br>                Plaintiff,<br><br>     v.<br><br>TRAVIS TUGGLE, et al.,<br><br>                Defendants. | Case No. 16-cr-20070-JES-JEH |

## ORDER AND OPINION

Now before the Court is Defendant Travis Tuggle's Motion to Suppress (Doc. 50), and the United States' Response (Doc. 51). For the reasons set forth below, the Defendant's Motion (Doc. 50) is DENIED.

### BACKGROUND

Defendant Travis Tuggle was indicted on August 1, 2017 in a two-count superseding indictment. Count 1 charges Defendant with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A). Doc. 41. Count II charges the Defendant with maintaining a drug-involved premises in violation of 21 U.S.C. § 856. *Id*. On July 6, 2018, the Defendant filed the present Motion to Suppress, arguing that evidence obtained from pole camera footage outside his residence constituted an impermissible warrantless search and should be suppressed. Doc. 50. Currently, the trial is scheduled for September 10, 2018.

"Operation Frozen Tundra" was an expansive investigation of a large-scale drug trafficking network active in several central Illinois counties, which took place from late 2013 to early 2016. Doc. 51, at 4. This investigation was approved as a "OCDETF" case, meaning that multiple federal agencies were cooperating and the overall drug network involved large-scale

1

trafficking and out-of-state suppliers. *Id*. Through the course of the investigation, the Government began to focus their attention on the Defendant and his accused co-conspirators. *Id*. at 1.

During the investigation, the Defendant maintained a residence at 709 North 9th Street, in Mattoon, Illinois. Doc. 50. Many customers and co-conspirators of the supposed drug trafficking ring were believed to live nearby the Defendant's residence. Doc. 51, at 2. This neighborhood was made up of frequently untraveled roads, and made physical surveillance difficult for investigators. *Id*. While the Government investigated the suspected offenders, they maintained three pole cameras on public property in the surrounding area of Defendant's residence. *Id*. Two of the three cameras were placed on a telephone pole in an alley between Dewitt and Piatt Avenues, just east of 9th Street and immediately next to the Defendant's residence. *Id*. These two cameras were placed on the same pole and shared a view of the Defendant's driveway and the front of his residence. *Id*. Defendant's driveway takes up the majority of the front yard. *Id*. at 6. The third camera was placed approximately one block south of the other cameras, in the 600 block of North 9th Street, which could also view the Defendant's residence but was primarily used to surveil co-defendant Joshua Vaultonburg's shed. Doc. 51, at 2.

Agents could remotely operate the cameras to zoom, pan, and tilt. *Id*. The cameras were equipped with rudimentary lighting technology to minimally assist the cameras' operation at night. *Id*. The cameras could not record audio, nor did they have infrared or any capabilities to view or capture anything inside the Defendant's residence that he did not expose to the public. *Id*. During the investigation, a few cameras intermittently stopped functioning and were replaced by identical models in the same locations. *Id*. at 3. The surveillance footage was viewable in real

time from the East Central Illinois Task Force's office in Mattoon and the data was stored on a server at the FBI's Springfield office. *Id.*

The pole cameras could only view the exterior of the Defendant's residence and the surrounding area of the house. *Id*. The Defendant's residence is located in a populated residential area and had no fence, wall, or other object that would obstruct the view of a passerby. *Id*. The pole cameras recorded roughly 100 instances believed to be the Defendant meeting with various couriers and suppliers. *Id*. Those individuals would park in the Defendant's driveway then often carry items such as tires, boxes, and bags into the Defendant's residence. *Id*. Those individuals would then leave with only the rims of tires, smaller sacks, and sometimes nothing at all. *Id*. The cameras further captured the Defendant carrying items across the street to co-defendant Josh Vaultonburg's shed. *Id*. at 4. Various witnesses have uniformly corroborated that the cameras captured couriers bringing the Defendant's shipments of methamphetamine and once they left, the Defendant's distributors would arrive to pay and pick up their batch of methamphetamine. *Id*. The pole cameras operated, in some fashion or another, from August 21, 2014, to March 2, 2016.[1] *Id*. The pole cameras captured footage of the Defendant's residence for approximately 18 months. *Id*. The lengthy nature of the investigation was largely attributed to the size and scope of the network, which extended well beyond Defendant and his particular conspiracy. *Id*. The Government never sought or received a warrant for the pole cameras. Doc. 50.

---

[1] The first camera, which was focused on the front of the Defendant's residence, was installed on August 21, 2014. That camera served as the only pole camera until September 25, 2015, when a second camera was installed providing the view of co-defendant Vaultonburg's residence (and also the Defendant's). The third camera (the second camera stacked with the first pole camera focused on the Defendant's residence) was installed on December 28, 2015. All cameras were removed on March 2, 2016.

## LEGAL STANDARD

The Fourth Amendment provides in part, that the people have a right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *U.S. v. Jones*, 132 S. Ct. 945, 949 (2012). "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 134 S. Ct. 2473, 2482 (2014). "A Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. Unites States*, 533 U.S. 27, 33 (2001). Furthermore, the Fourth Amendment protects people, not places. *Katz v. United States*, 389 U.S. 247, 351 (1967). What a person exposes to the public is not private, even in his home or office, but what he seeks to preserve as private, even in a public area, may be constitutionally protected. *Id*.

## ANALYSIS

Defendant argues in his Motion to Suppress that the Government violated his reasonable expectation of privacy secured by the Fourth Amendment when it conducted warrantless surveillance of his residence with pole cameras for 18 months. Doc. 50. The Government responds that Defendant did not have a reasonable expectation of privacy in the activities recorded by the pole cameras, and the length of the surveillance does not alter this analysis. Doc. 51.

**1. Reasonable Expectation of Privacy**

"The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (internal quotation omitted). Although much of the early Fourth Amendment jurisprudence regarding searches tied the doctrine to "common-law trespass," the Supreme Court has more recently recognized that Fourth Amendment "protects

people, not places"; thus, violations may occur even where the Government does not physically intrude on a constitutionally protected area. *Id.* (citing *United States v. Jones*, 565 U.S. 400, 405, 406, n. 3 (2012), *Katz v. United States*, 389 U.S. 347, 351 (1967)); *see also Kyllo v. United States*, 533 U.S. 27, 31 (2001) ("The permissibility of ordinary visual surveillance of a home used to be clear because, well into the 20th century, our Fourth Amendment jurisprudence was tied to common-law trespass.").

Following *Katz*, "[w]hen an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' [the Supreme Court has] held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Id.* (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). In *California v. Ciraolo*, the Supreme Court stated that "[t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." 476 U.S. 207, 213 (1986). However, "[a]s technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes, [the Supreme] Court has sought to 'assure preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.' " *Carpenter*, 138 S. Ct. at 2214 (quoting *Kyllo*, 533 U.S. at 34). Thus, in *Kyllo*, the Supreme Court held that the use of a thermal imager to detect heat radiating from the side of a home was a search under the Fourth Amendment and thus required a warrant. 533 U.S. at 34. In so holding, the Court reasoned that "obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area,' *Silverman,* 365 U.S., at 512, 81 S.Ct. 679,

constitutes a search—at least where (as here) the technology in question is not in general public use." *Id*.

Defendant takes issue with the Government surveilling the outside of his house and driveway with cameras affixed to a utility pole adjacent to his property. "When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred." *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (citing *Florida v. Jardines*, 569 U.S. 1, 11 (2013)). However, it is undisputed here that law enforcement never physically intruded on Tuggle's property when they installed and monitored the pole cameras. Because law enforcement did not trespass on Tuggle's property in order to surveil his activities, the inquiry becomes whether he had a subjective expectation of privacy in his driveway and front of his house. "[A] Fourth Amendment search does *not* occur— even when the explicitly protected location of a *house* is concerned—unless "the individual manifested a subjective expectation of privacy in the object of the challenged search," and "society [is] willing to recognize that expectation as reasonable." *Kyllo*, 533 U.S. at 33 (quoting *Ciraolo*, 476 U.S. at 211).

Here, Defendant's residence was located in a populated residential area and had no fence, wall, or other object that would obstruct the view of a passerby. The lack of any attempt to obscure his driveway or residence from public view weights against a finding that he "manifested a subjective expectation of privacy in the object of the challenged search." *Kyllo*, 533 U.S. at 33. Even if Defendant had a subjective expectation of privacy in his driveway and the front of his house, it is not one that society would find reasonable. *See, e.g., United States v. Evans*, 27 F.3d 1219, 1228 (7th Cir. 1994) ("The agents' approach to the garage did not implicate a Fourth Amendment interest because Evans did not present any evidence at the

suppression hearing that he had a reasonable expectation of privacy in the driveway."). Significantly, the pole cameras could only view the exterior of the Defendant's residence and the surrounding area of the house. The cameras only captured what would have been visible to any passerby in the neighborhood. Thus, this case is unlike the thermal imaging that was found to be a search in *Kyllo*. 533 U.S. at 34. And while the Supreme Court has recently extended Fourth Amendment protections to address surveillance methods implicating new technologies, the surveillance here used ordinary video cameras that have been around for decades. *Cf. Carpenter v. United States*, 138 S. Ct. 2206 (2018), *Riley v. California*, 134 S. Ct. 2473 (2014), *United States v. Jones*, 565 U.S. 400 (2012). In fact, when extending Fourth Amendment protections to cell site location information, the Supreme Court specifically stated that its decision did not "call into question conventional surveillance techniques and tools, *such as security cameras*." *Id*. at 2220 (emphasis added).

The Court further finds the defendant had no expectation of privacy in the third camera that was placed approximately one block south of the other cameras, in the 600 block of North 9th Street, which could also view the Defendant's residence but was primarily used to surveil co-defendant Joshua Vaultonburg's shed.

**2. Long–term Pole Camera Surveillance Under the Fourth Amendment**

The remaining question before the Court is whether this 18-month surveillance violated the defendant's reasonable expectation of privacy. Defendant analogizes the facts here to the placing of GPS tracking on a car. Long periods of GPS tracking have been found to impinge on an expectation of privacy. *United States v. Jones*, 565 U.S. 400, 414 (2012). The Court does not find that analogy applicable here. Pole cameras are limited to a fixed location and capture only activities in camera view, as opposed to GPS, which can track an individual's movement

7

anywhere in the world. The Seventh Circuit has not made a dispositive ruling on the long-term warrantless use of pole cameras. However, several other circuits have been presented with this issue and all of them have allowed the evidence to be admitted. *See United States v Houston,* 813 F.3d 282, 289 (6th Cir. 2016) (warrantless use of pole camera footage for over 10 weeks); *United States v Bucci*, 582 F.3d 108, 116–17 (1st Cir. 2009) (approving eight months of warrantless pole camera surveillance); *United States v Mazzara*, 2017 U.S. Dist. Lexis 178575 (S.D.N.Y. Oct. 27, 2017) (finding 21 months of pole camera surveillance of a residence from across the street did not violate Fourth Amendment right). At some point the length of monitoring may constitute a search. Here, the facts and case law from other circuits do not support a finding that the extended surveillance at issue here constitute that search. Therefore, the Motion to Suppress is respectfully denied. The matter remains set for Pre-Trial for August 13, 2018 at 2:30 pm and Jury Trial September 10, 2018 at 9:00 am.

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress (Doc. 50) is DENIED.


Signed on this 31st day of July, 2018.

s/ James E. Shadid
James E. Shadid
Chief United States District Judge
